UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Robert Peterson,<br>*Plaintiff,*<br><br>v.<br><br>Windham Community Memorial Hospital, Inc.,<br>*Defendant.* | Civil No. 3:09cv511 (JBA)<br><br><br><br>March 24, 2011 |

RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Robert Peterson filed a Second Amended Complaint on September 25, 2009 claiming that by amending and/or terminating benefits under its Retiree Health Insurance Program, Defendant Windham Community Memorial Hospital ("Windham") breached a promise to provide Peterson with lifetime health insurance benefits and is accordingly liable to Peterson under ERISA §§ 502(a)(1)(b) and (a)(3) for ERISA estoppel and breach of contract; and by failing to provide Peterson with accurate information about his insurance benefits while Peterson was a plan participant, and after Peterson requested information through his attorney, Windham breached its fiduciary duty to Peterson under ERISA § 502(a)(3) and violated its duty to supply requested information under ERISA § 502(c)(1). Windham has moved [Doc. # 42] for summary judgment on all counts of Peterson's Second Amended Complaint. For the reasons discussed below, Windham's Motion for Summary Judgment will be granted.

I.  Relevant Factual Background

In 1982, Windham hired Peterson, then 22 years old, as a medical technologist. Peterson worked for Windham until April 30, 2007, and during that time received promotions to supervisor of the blood bank and transfusion services, laboratory operations

director, laboratory director, administrative director of laboratory and radiology, assistant vice president for business development, and vice president of operations, respectively. Beginning February 1, 1982, Peterson participated in the Windham Retiree Health Insurance Eligible Plan ("Plan"), which, upon Peterson's retirement, would entitle him to the same health benefit coverage as active Windham employees.

Although Martin Levine, Vice President of Human Resources at Windham, testified during his Rule 30(b)(6) deposition that he could not find and had never seen a Summary Plan Description ("SPD") for the Plan and did not know whether one existed (Levine Dep., Ex. 2 to Pl.'s 56(a)2 Stmt. [Doc. # 57], at 11:12–15, 14:15–18, 16:7–10, 72:2–13), Windham produced five documents that it claims are Plan SPD's from various time periods (Def.'s Loc. R. 56(a)1 Stmt. [Doc. # 44] ¶ 6, Exs. L, M, N, O, P). These SPDs describe Windham's Employee Medical Plan and are not limited to retiree benefits; in fact, the first two SPDs, with October 1, 1992 and April 1, 1996 effective dates, do not explicitly provide that retirees are eligible for medical benefits (Exs. L, M to Def.'s 56(a)1 Stmt.). An SPD effective October 1, 1999 provides that a full–time employee hired prior to October 1, 1988 who had "attained at least age 50 . . . and just prior to his or her retirement had completed at least 15 years of continuous, full–time service" would be eligible for Plan coverage. (10/1/99 SPD, Ex. N to Def.'s 56(a)1 Stmt., at 9.) An additional undated SPD lists the same retiree eligibility criteria (Ex. O to Def.'s 56(a)1 Stmt. at 33), and an SPD effective October 1, 2003 provides that a retired employee "meeting all requirements for retiree health insurance coverage by your Employer" would be eligible for coverage (10/1/03 SPD, Ex. P to Def.'s 56(a)1 Stmt., at 12).

Peterson understood his eligibility for retiree health benefits in a similar light to the eligibility criteria listed in the 1999 SPD, believing that in order to qualify for full health

benefits "I had to work until I was 50, and I had to have at least 15 years of continuous full–time service." (Peterson Dep., Ex. A to Def.'s 56(a)1 Stmt. at 78:4–17.) A brochure dated January 2004 contained the same eligibility criteria with respect to retirees (Ex. H to Def.'s 56(a)1 Stmt.), as did a June 24, 1997 memorandum to department managers (Ex. J to Def.'s 56(a)1 Stmt.). However, Peterson had not seen the brochure at the time of its distribution (Peterson Dep. at 99:21–100:18) and did not recall receiving the 1997 memorandum, although he did recall sometimes receiving similar documents describing modifications to Windham benefits (*id.* at 158:22–160:3). These documents contained provisos that their contents may be modified by Windham. (Exs. H, J to Def.'s 56(a)1 Stmt.)

Each of the SPDs explicitly reserves Windham's rights to modify, amend, or terminate the medical–benefits plan. (Ex. L to Def.'s 56(a)1 Stmt. at IV–9, Ex. M at 71, Ex. N at 95, Ex. O at 52, Ex. P at 111.) Peterson nonetheless believed that Windham had, in effect, promised him that if he satisfied the eligibility criteria, he would receive lifetime benefits. He testified in his deposition that he never saw any document that reserved Windham's right to modify or terminate the Plan. (Peterson Dep. at 111:23–114:3, 160:9–25.) He also testified that he never saw in any document that Windham could not modify or terminate the Plan, but recalled oral statements made at "staff meetings and department head meetings" that implied the insurance benefit "guaranteed health insurance for life." (*Id.*) He also recalled that Windham human resources directors as well as CEOs John Peck and Fred Hyde told him that the retiree health insurance benefit was "guaranteed for life." (*Id.* at 37:23–38:13.)

Several Windham letters and memoranda addressed to employees and retirees also bear on the issue of medical benefit longevity. A February 5, 1980 letter from John Peck to

3

"Health Insurance Plan Participants" explains: "eligible employees, retirees, and their spouse may look forward to continued health insurance on a no cost basis." (Ex. 7 to Pl.'s 56(a)2 Stmt.) An October 6, 1986 letter from Peck to "Retirees" provides: "the Board of Trustees and the Administrators of your hospital will continue your present benefits, and improve them whenever possible." (Ex. 6 to Pl.'s 56(a)2 Stmt. at 2.) A July 19, 1988 letter from Fred Hyde to "Employee" states that medical benefits "will be provided to you as a retiree on the same basis as they are provided to Windham employees." (Ex. 5 to Pl.'s 56(a)2 Stmt. at 1.)

Peterson recalled turning down a job opportunity during the 1990s for a lab director position at Cape Cod Hospital that would have paid him between $5,000 and $10,000 more than he earned at Windham because he did not want to forego the insurance benefit at Windham. (Peterson Dep. at 148:5–151:2.) Peterson also rejected an opportunity during the 1990s to work in business equipment sales for a company named Admiral that would have paid him "at least" $10,000 more than he earned at Windham "based on a number of factors" including the "promise of . . . health insurance for life" at Windham and the fact that the Admiral position was not in the medical field. (*Id.* at 151:12–154:12.) Peterson interviewed for a lab director position at Manchester Memorial Hospital during the 1990s as well, but after becoming a finalist for that position, which Manchester ultimately did not fill for financial reasons, Peterson "pretty much reached a decision" that he would not accept the position if it were offered because Manchester did not provide a lifetime health insurance benefit. (*Id.* at 154:13–156:22.)

Windham terminated the retiree health insurance benefit on April 1, 2006 for all non–union employees who did not meet the age and service requirements as of that date. (Ex. D to Def.'s 56(a)1 Stmt.) Peterson, as a member of Windham's Executive Committee,

4

participated in this decision to discontinue retiree health insurance; he "didn't like the fact" that Windham was discontinuing the benefit but "understood the math" that underscored the decision and ultimately deferred to the legal advice "that it is fair game to remove this benefit." (Peterson Dep. at 62:6–64:6, 114:8–116:10.)

On the same date that Windham discontinued the Plan, it introduced the Windham Community Memorial Hospital Retiree Reimbursement Account, from which eligible non–union employees could receive reimbursement for medical expenses in an amount calculated on the basis of the employees' age, years of service, and coverage election. (Exs. C, D to Def.'s 56(a)1 Stmt.) Peterson's RRA account was valued at $52,804.00. (Pl.'s Answers to Def.'s Interrogs., Ex. Q to Def.'s 56(a)1 Stmt., at ¶ 6.) Peterson resigned from Windham on April 30, 2007, at which point he was 48 years old and therefore did not satisfy his service requirements for either the Plan or the new RRA benefit, a fact that Peterson was aware of when he left. (Peterson Dep. at 29:7–9; 78:4–21; 82:4–83:12) On February 25, 2008, Peterson's counsel, Barbara Gardner, sent a letter to Martin Levine, Vice President of Human Services at Windham, requesting "a copy of all plan documents, as well as the Summary Plan Description for the Post Retirement Health Benefit Program in place for non–union employees prior to April 1, 2006." (2/25/08 Letter, Ex. R to Def.'s 56(a)1 Stmt.)

II. Discussion[1]

    A.    Peterson's Third Count: Contractual Vesting[2]

In the Third Count of his Second Amended Complaint, Peterson alleges that Windham "promised through written and oral communications to provide health benefits for life to plan participants" and by terminating the Plan in April 2006 "breached the contract to provide such benefits contained in the Plan." (Second Am. Compl. [Doc. # 15] ¶¶ 25–28.) Windham moves for summary judgment on this count on the ground that the retiree insurance benefit Plan, an ERISA welfare benefit plan, had not vested, and therefore Windham had the right to alter or terminate the Plan. (Mem. Supp. at 12–13.) Windham argues that the default presumption is that an ERISA welfare benefit plan is not vested, and in order to overcome this presumption, a plaintiff must point to plan documents that contain "specific written language that is reasonably susceptible to interpretation as a promise to vest the benefits." (*Id.* at 13.) Because Peterson cannot point to any written language that can reasonably be interpreted as a promise not to eliminate the Plan, Windham argues that Peterson's breach of contract claim under ERISA fails as a matter of

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

[2] The Court addresses the Counts in Peterson's Second Amended Complaint in the order that Windham addresses them in its Memorandum in Support [Doc. # 43] of its Motion for Summary Judgment.

law. (*Id.* at 13–17.) Peterson counters that letters and memoranda to Windham employees and retirees (Exs. 5, 6, 7 to Pl.'s 56(a)2 Stmt.) constitute written "language capable of reasonably being interpreted as creating a promise which can be enforced under ERISA," and because of this ambiguous language, summary judgment is inappropriate. (Mem. Opp'n [Doc. # 55] at 8–11.)

"Under ERISA it is the general rule that an employee welfare benefit plan is not vested and that an employer has the right to terminate or unilaterally to amend the plan at any time." *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 77 (2d Cir. 1996). An employer's agreement to vest welfare benefits, however, binds that employer and will be enforced. *Id*; *see also Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 82 (2d Cir. 2001) (*Devlin II*) ("[E]ven though Empire is 'generally free' to modify its life insurance plan, if Empire promised vested benefits, those benefits will be enforced.").

In order to survive a motion for summary judgment, a plaintiff claiming vested ERISA welfare benefits does not need to point to a promise to vest in a formalized plan document or written in precise language; "[i]t is enough if she can point to written language capable of reasonably being interpreted as creating a promise on the part of [the employer] to vest her . . . benefits." *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 77–78 (2d Cir. 1996) (reversing district court decision that letter promising that "the initial twelve months of severance pay may be taken in one lump–sum payment on the day of your termination or bi–weekly over the twelve months after your termination" did not create a promise to vest severance benefits). If the plaintiff can point to a document that "unambiguously indicates whether retiree medical benefits are vested, the unambiguous language should be enforced." *American Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116

7

F.3d 976, 989–81 (2d Cir. 1997) (holding that collective bargaining agreement that provided that "[d]uring the term of this Agreement there shall be no reduction in the schedule of benefits . . . unambiguously established that once the CBAs expired, Multifoods was free to reduce retiree medical benefits").

However, this does not mean that a plaintiff must be able to point to unambiguous vesting language in order to survive summary judgment; language "capable of reasonably being interpreted as creating a promise" is sufficient. *Id.* at 980 (quoting *Schonholz*, 87 F.3d at 78). If a plaintiff can point to ambiguous language that is reasonably susceptible to interpretation as a promise to vest, that plaintiff is entitled to get to a trial. *Devlin II*, 274 F.3d at 83–85 (holding that SPD language that "retired employees, after completion of twenty years of full–time permanent service and at least age 55 *will be insured*" and that life insurance benefits "will remain [at the annual salary level] *for the remainder of their lives*" could be reasonably read as a promise to vest benefits and accordingly created a triable issue of fact); *see also Joyce v. Curtiss–Wright Corp.*, 171 F.3d 130, 134 (2d Cir. 1999) (holding that "statements such as '[t]he GIAs state that insurance 'will be provided for employees receiving or becoming entitled to receive pension payments'' and 'the 1965 GIA expressly provides for the 'termination' of retiree insurance upon a retiree's 'death or attaining the age at which he comes or could become eligible for Medicare''" could not be reasonably interpreted as a promise by Curtiss–Wright to vest retirees' health benefits and thus did not require resolution by a trier of fact).

Written communications outside the SPD or other plan documents may be considered in evaluating whether an employer promised to vest ERISA welfare benefits. However, in order to modify an express reservation of rights in an SPD to terminate or

8

amend, the written communications must be "formal" in the sense that they proclaim to be binding statements of the plan as opposed to explanatory communications between the employer and employees. *Compare Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492–93 (2d Cir. 1988) (where "[t]he SPDs and all but one booklet have for over seven decades indicated in a straightforward way Metropolitan's reservations of a right to amend or terminate," a single booklet that omitted that reservation and noted that it was not a complete statement of plan terms and filmstrips and other presentations that used "language such as 'lifetime' or 'at no cost'" but "did not purport to be complete binding statements of plan terms" did not override the express reservations of the right to amend or terminate in the SPD), *with Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 62–63 (2d Cir. 2006) (while a letter from the union president on official stationery sent to all participants in the union–staff health plan detailing modifications to the plan "could potentially be construed as a statutorily required notice of a material modification, and thus sufficiently formal to be considered," the actual letter language that promised lifetime benefits to surviving spouses of plan participants did not create a promise to vest benefits for retirees). In addition, oral promises that purport to alter the terms of an ERISA plan are unenforceable. *Ladouceur v. Credit Lyonnais*, 584 F.3d 510, 512–13 (2d Cir. 2009) (citing *Perreca v. Gluck*, 295 F.3d 215, 225 (2d Cir. 2002).

Each of the five SPDs produced by Windham during discovery expressly reserves its right to terminate benefits under the Plan. (Ex. L to Def.'s 56(a)1 Stmt. at IV–9, Ex. M at 71, Ex. N at 95, Ex. O at 52, Ex. P at 111.) That unambiguous language, coupled with the absence of any promissory language in the SPDs to the effect that the benefits would not be eliminated, buttresses the presumption that Windham did not agree to vest Peterson's Plan

9

benefits and has not breached its agreement in violation of ERISA. Peterson nonetheless points to language in Windham letters and memoranda as creating a disputed issue of fact as to vesting. He argues that the language in the July 19, 1988 letter that medical benefits "will be provided" (Ex. 5 to Pl.'s 56(a)2 Stmt. at 1), in the October 6, 1986 letter that the Board and Administrators of Windham "will continue your present benefits" (Ex. 6 at 2), and in the February 5, 1980 letter that "eligible employees, retirees, and their spouse may look forward to continued health insurance" (Ex. 7 at 3), comports with the plan language in *Devlin II* and can reasonably be interpreted as a promise to vest benefits. (Mem. Opp'n at 9–10.) The Court disagrees for two reasons.

First, even if these letters and memoranda were official communications from Windham officers John Peck and Fred Hyde to their employees, they do not hold themselves out as formal modifications of the Plan such that they can overcome the explicit terms of the SPDs themselves. None of these communications purported in any way to be complete or binding statements of the Plan, instead they only served to answer questions about or summarize the Plan. *Cf. Bouboulis*, 442 F.3d at 62–63; *Moore*, 856 F.2d at 492–93. Importantly, despite the optimistic intentions with regard to future benefits, the letters do not expressly override the reservation of rights to modify or terminate contained in the SPDs. *See Moore*, 856 F.2d at 492–93. These letters are therefore ineffectual to override the terms of the SPDs.

Second, even if these communications were sufficiently "formal" so as to be deemed to impact the terms of the SPDs, their language cannot be reasonably interpreted as creating a promise to vest Plan benefits. Where the language in the SPDs in *Devlin II*, 274 F.3d at 83–85, that "retired employees, after completion of twenty years of full–time permanent

service and at least age 55 *will be insured*" could reasonably be interpreted as a promise to provide insurance, the use of the word "will" in the July 19, 1988 and October 6, 1986 letters describes retirees' benefits under the current plan, not an irrevocable guarantee that they will continue to have insurance that will provide those benefits for life if they provide a certain term of service. The July 1988 letter reads in relevant part: "These benefits . . . will be provided to you as a retiree on the same basis as they are provided to Windham employees." (Ex. 5 to Pl.'s 56(a)2 Stmt. at 1.) It explains what benefits "will be provided" under the Plan, but unlike the SPDs in *Devlin II*, it does not promise that the Plan will remain in place in exchange for a set period of service. The SPD language in *Devlin II*, because it provided that retirees will be insured after completing their eligibility requirements could be construed "as an offer for a unilateral contract," such that Empire promised the insurance in exchange for a period of service. The July 1988 letter does not contain similar language that might be construed as a promise to insure any employee who satisfied the eligibility requirement. Instead, the letter explains what benefit retirees will receive under the current plan, it does not promise that in exchange for service, that plan will remain in effect for participants' lifetime. The October 1986 letter reads: "You can be assured that the Board of Trustees and the Administration of your hospital will continue your present benefits, and improve them whenever possible." (Ex. 6 to Pl.'s 56(a)2 Stmt. at 2.) This optimistic statement similarly does not guarantee future benefits in exchange for service, but instead evinces a hope that present benefits will continue.

The use of "will" in these letters is closer to that in *Joyce*, 171 F.3d at 134, where the statement that "insurance 'will be provided for employees receiving or becoming entitled to receive pension payments'" did not bind the employer "to vest the benefits at issue." As

11

opposed to the promissory language in *Devlin II*, the language in *Joyce* explained what insurance benefits would be provided to those who ultimately became entitled to pension payments; it did not provide that in exchange for a set period of service, retirees will be insured. *Id.* The language in letters from Hyde and Peck similarly describes what benefits will be provided under the plan *if* that plan remains in force; it does not offer a bargained–for exchange whereby if the employee provides a certain amount of service, the employer guarantees receipt of the specified benefit. The February 5, 1980 memorandum, containing the statement that employees "may look forward to continued health insurance" (Ex. 7 to Pl.'s 56(a)2 Stmt.) is even further from a promise to vest retirement benefits. Encouraging employees regarding what they "may look forward to" is not an irrevocable, lifetime promise to provide that to which they are looking forward. This language cannot, therefore, reasonably be interpreted to create a promise to vest benefits.

Mr. Peterson appears to conflate a statement of present intent to provide a benefit with binding durational or promissory language. The SPDs do not describe the health insurance as a "lifetime" benefit, and although Windham stated its intention to offer a particular benefit for the length of employees' retirement, that intention alone is insufficient as a promise to vest the benefit for the lifetime of its retirees. Peterson thought that he would receive a lifetime benefit, but Windham terminated the Plan that would have provided that benefit before he qualified for eligibility. Counsel for the parties agreed that the Plan arose in an era when employer benefit plans frequently lacked the formality seen today and the contemplation at that time was to provide benefits for a retiree's lifetime. But under the changes that came with ERISA, those benefits did not vest unless the Plan said so. *See Schonholz*, 87 F.3d at 77. Ultimately, the language on which Peterson relies expresses a

hopeful intent to provide welfare benefits for retiring employees; it does not express an irrevocable promise to provide lifetime benefits. Windham is accordingly entitled to summary judgment on Count Three of Peterson's Second Amended Complaint.

B.      Peterson's Second Count: ERISA Estoppel

In the Second Count of his Second Amended Complaint, Peterson alleges that he relied on Windham's promise of "health benefits 'for life' both verbally and in writing" by "remain[ing] employed by [Windham] at a lower than market salary through April 1, 2006 and thereafter, and refus[ing] offers of higher paying jobs" to Windham's benefit. (Second Am. Compl. ¶¶ 20–23.) In moving for summary judgment on this count, Windham argues that Peterson's estoppel claim fails because Peterson cannot demonstrate a promise by Windham to continue the health benefit for life or reasonable reliance on a promise by Windham, nor can he identify the "extraordinary circumstances" required to maintain an ERISA estoppel claim. (Mem. Supp. at 17–21.) Peterson responds that material issues of fact exist with respect to his promissory estoppel claim, arguing that he "has provided evidence sufficient to support a claim of promissory estoppel, including extraordinary circumstances because of the promises, orally and in writing, of what [Peterson] reasonably understood to be guaranteed health benefits for life." (Mem. Opp'n at 11–12.)

In order to prevail on a promissory estoppel claim under ERISA, a plaintiff must prove "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced, and must adduce . . . facts sufficient to [satisfy an] extraordinary circumstances requirement as well." *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 109 (2d Cir. 2008) (internal quotation marks and citations omitted); *see also Schonholz*, 87 F.3d at 78–79. Because oral promises are unenforceable under ERISA and

cannot vary the terms of an ERISA plan, an oral promise cannot give rise to an ERISA estoppel claim; a plaintiff must be able to point to written language that can reasonably be construed as a promise. *Perreca*, 295 F.3d at 224–25; *Adams v. Tetley*, 363 F. Supp. 2d 94, 110 (D. Conn. 2005). In order to satisfy the "extraordinary circumstances" requirement of ERISA estoppel, a plaintiff must demonstrate that the surrounding circumstances are beyond those required to satisfy the ordinary elements of estoppel; he or she must show that the employer used the promise to "intentionally induce [a] particular behavior" on the plaintiff's part only to renege on that promise after inducing the sought after behavior. *Devlin v. Transp. Commc'n Int'l Union*, 173 F.3d 94, 102 (2d Cir. 1999) (*Devlin I*) (holding that employees could not demonstrate extraordinary circumstances where they were promised that health benefits would be paid throughout their retirement but their plan was later amended to allow for the termination of benefits and "there [was] no evidence to suggest that [the employer] sought the retirement of any of the [employees], or that the promise of free, lifetime health benefits was used to intentionally induce any particular behavior"); *see also Devlin II*, 274 F.3d at 86–87 ("From [statements explaining that Empire used its benefits program to compete with organizations that paid higher salaries] a trier of fact could reasonably conclude that Empire intentionally promised lifetime insurance benefits to lure (and retain) employees away from other firms paying higher salaries and then denied those benefits after the employees were of an age where they could neither make up the salary difference or obtain alternative benefits at a reasonable cost. If so found, we believe that such a practice constitutes 'extraordinary circumstances.'")*; Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 152 (2d Cir. 1999) (no extraordinary circumstances

where "[n]othing . . . suggesting that United Way made a promise to Aramony in order to induce him to take action for United Way's benefit only later to renege on that promise").

Peterson's promissory estoppel claim fails because Peterson is unable to demonstrate a promise by Windham to provide "health benefits for life." As discussed above, none of the letters or memoranda from Windham to employees and retirees (Exs. 5, 6, 7 to Pl.'s 56(a)2 Stmt.) can reasonably be interpreted to irrevocably promise lifetime benefits to Plan participants. Without written language that can reasonably be interpreted as a promise to provide lifetime benefits, as discussed above, Peterson's estoppel claim must necessarily fail. *Perreca*, 295 F.3d at 224–25; *Adams*, 363 F. Supp. 2d at 110.

Peterson also has not shown evidence of the extraordinary circumstances required of ERISA estoppel claims. Although Peterson claims that he forewent job opportunities that offered higher salaries (Peterson Dep. at 148:5–156:22) and that he had been told several times that Windham made up for its lower salaries by offering this "rich benefit package" (*id.* at 62:20–63:5, 113:10–20) there is no evidence that suggests Windham made a promise of lifetime benefits to lure and retain employees from other facilities, only to later renege on that promise. *See Devlin II*, 274 F.3d at 86–87. Peterson's claim that he relied on the alleged oral promise of lifetime benefits in declining other opportunities represents no more than the ordinary reliance required of a promissory estoppel claim. *See Aramony*, 191 F.3d at 152; *Devlin I*, 173 F.3d at 102. In fact, Peterson's participation in the committee meetings at which the benefit termination decision was made on financial grounds (Peterson Dep. at 114:8–116:2), demonstrates the lack of an intentional plan on Windham's part to induce action by extending the benefits program and then cancelling it. *See Aramony*, 191 F.3d at 152.

Because the facts show that Peterson cannot establish an enforceable promise to provide lifetime benefits or extraordinary circumstances, Windham is entitled to summary judgment on Count Two of Peterson's Second Amended Complaint.

### C. Peterson's First Count: Breach of Fiduciary Duty

Peterson alleges in the First Count of his Second Amended Complaint that Windham breached its fiduciary duty under ERISA by failing to "provide accurate information about the existence of 'lifetime' health insurance benefits at a particular level" and failing to "administer the Plan in accordance with its terms." (Second Am. Compl. ¶¶ 16–19.) In moving for summary judgment on this count, Windham argues that without pointing to a written document that shows misrepresentation by Windham that its program provided "lifetime benefits," Peterson cannot successfully maintain a breach of fiduciary duty claim by relying solely on "oral representations" by Windham. (Mem. Supp. at 21–22.) Peterson argues in opposition that there is a triable issue of fact with respect to its breach of fiduciary duty claim due to Windham's "failure to disclose circumstances under which [Peterson] could lose the benefit and whether or not [Peterson] was prejudiced" in that Windham failed to provide employees with an SPD for the Plan. (Mem. Opp'n at 5–7.)

Windham correctly points out that, as with the contractual vesting and promissory estoppel claims, the breach of an oral promise cannot give rise to ERISA breach of fiduciary duty claims. *Ladouceur*, 584 F.3d at 512–13. Peterson, in clarifying his breach of fiduciary duty claim, is also correct in arguing that under ERISA § 104(b), Summary Plan Descriptions and annual reports must be published to participants and beneficiaries of the plan, and the failure to comply with this publication requirement can constitute a breach of fiduciary duty. 29 U.S.C. § 1024(b); *Weinreb v. Hosp. for Joint Diseases Orthopaedic Inst.*, 404 F.3d 167, 171

& n.1 (2d Cir. 2005). In order to maintain a breach of fiduciary duty claim based on failure to provide an SPD, a plaintiff must make a showing of "likely prejudice," meaning that he or she "was likely to have been harmed" where no SPD has been distributed. *Weinreb*, 404 F.3d at 171 (applying the likely prejudice standard of *Burke v. Kodak Ret. Income Plan* to a claim that no SPD was distributed); *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 113 (2d Cir. 2003) ("[W]e require, for a showing of prejudice, that a plan participant or beneficiary was *likely* to have been harmed as the result of a deficient SPD.") (emphasis in original).

Windham argues in its Reply Memorandum that Peterson cannot demonstrate prejudice as the result of his mistaken impression that he had health insurance for life because of his participation in the April 2006 decision to discontinue the retiree health benefits. (Reply at 4.) In essence, Windham claims that he cannot plead ignorance with respect to Windham's ability to cancel the benefit when he saw the cancellation play out in front of him and did nothing to stop it. (*Id.*) This argument, however, misses the point; although Peterson became aware of Windham's ability to terminate benefits in 2006, he claims that for the length of his stay at Windham, which began in 1982, he remained because he was under the mistaken impression that his retirement health benefits could not be cancelled. (Mem. Opp'n at 6.) By demonstrating that he forewent other job opportunities because he had not seen the SPDs and accordingly did not know that his retirement health benefits could be terminated, Peterson has demonstrated a genuine issue of material fact as to whether he was "likely to have been harmed" by the failure to provide SPDs. *See Weinreb*, 404 F.3d at 171; *Burke*, 336 F.3d at 113.

Even though there is a genuine issue of material fact as to whether Peterson would have been prejudiced if Windham failed to provide him with an SPD, Windham is

nonetheless entitled to summary judgment because there is no evidence in the record that Windham actually failed to provide Peterson with an SPD in compliance with ERISA § 104(b), which requires that "[t]he administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description . . . within 90 days after he becomes a participant." 29 U.S.C. § 1024(b)(1)(A). Although Peterson testified that he was routinely told that his retiree health benefits were guaranteed, he never specifically testified that he was not provided with a Plan SPD while employed by Windham, nor has he pointed to any evidence in the record that demonstrates that Windham did not provide SPDs to its employees. Peterson relies in whole on Levine's testimony that Levine could not find and had never seen a Summary Plan Description ("SPD") for the Plan and did not know whether one existed (Levine Dep., Ex. 2 to Pl.'s 56(a)2 Stmt., at 11:12–15, 14:15–18, 16:7–10, 72:2–13). Levine's uncertainty regarding the SPD does not bear on whether Peterson received an SPD after enrolling in the Plan. Instead, Peterson's claim of breach of fiduciary duty is left to rest on alleged oral statements that he was receiving a lifetime benefit, which provide an insufficient basis for a breach of fiduciary duty claim. *See Ladouceur*, 584 F.3d at 512–13.

Windham is therefore entitled to summary judgment on Count One of Peterson's Second Amended Complaint.

D. Peterson's Fourth Count: Failure to Provide Summary Plan Description

In the fourth and final count of his Second Amended Complaint, Peterson alleges that Windham violated ERISA § 502(c)(1) in failing to provide a copy of the SPD in response to Peterson's requests through his attorney. (Second Am. Compl. ¶¶ 29–33.) Windham moves for summary judgment on this count on the grounds that because Peterson was not

a plan "participant or beneficiary" at the time of the requests, Windham had no obligation under ERISA to provide the SPD; the obligation to provide the SPD does not extend to plans that have been terminated prior to the request; and the failure to satisfy this ERISA requirement is not actionable of itself without a showing of prejudice. (Mem. Supp. at 22–24.)

> ERISA § 502(c)(1) provides in part:
>
> Any administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title, section 1021(e)(1) of this title or section 1021(f), or section 1025(a) of this title with respect to a participant or beneficiary, or (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1). "Participant" in this context "is naturally read to mean either employees in, or reasonably expected to be in, currently covered employment, or former employees who have . . . a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117 (1989). An individual is only entitled to damages under this statute if that individual can establish that he or she fits within the definition of "participant." *See Kreinik v. Showbran Photo, Inc.*, 400 F. Supp. 2d 554, 559 (S.D.N.Y. 2005); *see also Bloom v. Manager Emp. Benefits Emp. Ret. Plan Comm. Chicago Pneumatic Tool Co.*, No. H–87–412 (JAC), 1988 WL 47900, * 2 (D. Conn. Apr. 22, 1988).

According to Peterson, he resigned from Windham on April 30, 2007. (Peterson Dep. at 29:7–9.) Thus, he cannot demonstrate that in February 2008, when he claims to have requested Plan documents through his counsel, he was in, expected to be in, or had a reasonable expectation to return to "covered employment." In addition, as discussed above, Peterson does not have a "colorable claim to vested benefits," having failed to point to any written language from Windham that could reasonably be interpreted as a promise to vest his retirement insurance benefits. Accordingly, he is not a Plan "participant" under ERISA § 502(c)(1), and Windham is entitled to summary judgment on Count Four of Peterson's Second Amended Complaint.

III. Conclusion

For the reasons stated above, Windham's Motion [Doc. # 42] is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 24th day of March, 2011.